**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RODNEY S., | ) | |
| | ) | |
| Plaintiff, | ) | No. 20-cv-1230 |
| | ) | |
| v. | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| KILILO KIJAKAZI, Acting Commissioner | ) | |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Rodney S.[1] appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his disability benefits. The parties have filed cross motions for summary judgment.[2] As detailed below, Plaintiff's motion for summary judgment [dkt. 18] is GRANTED and the Commissioner's motion for summary judgment [dkt. 24] is DENIED; the Court remands the case to the agency with the instruction to calculate and award benefits to Plaintiff.

**1.    Background**

**1.1.    Procedural History**

Plaintiff was born in 1974. [Administrative Record ("R.") 14.] It appears Plaintiff was granted Supplemental Security Income ("SSI") payments as a child when he was about 10 years old.[3] [R. 34, 114.] "SSI provides monthly cash payments to help meet the basic needs of children who have a physical or mental disability or who are blind." Social Security Administration ("SSA"), *SSI Eligibility for Children*,

---

[1]    In accordance with Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff only by his first name and the first initial of his last name(s).

[2]    Plaintiff has filed a Brief in Support of his Motion to Reverse the Decision of the Commissioner of Social Security [dkt. 18], which the Court construes as a motion for summary judgment.

[3]    Much of Plaintiff's pre-2007 SSA history is murky as it comes from the 2008 ALJ's recitation of Plaintiff's "DIBwiz" history. [*See* R 114-15.] The Record before the Court does not appear to contain this DIBwiz document or any other document that provides a full picture of Plaintiff's administrative history. Thus, this history has been pieced together as best as possible by the documents available to the Court within the Record. Similarly, the Record contains scant pre-2008 details of Plaintiff's job history and medical history, so the Court has done the same with respect to these sections, *infra*.

https://www.ssa.gov/benefits/disability/apply-child.html (last accessed July 9, 2021).

After his child's SSI benefits expired, Plaintiff filed an application for benefits in November 1992 when he turned 18. [R. 114.] The Record does not indicate whether that 1992 application for benefits was granted. Plaintiff filed another application for benefits circa 2000, which was denied after a hearing before an ALJ. [*Id.*] Neither the transcript from that Administrative Hearing nor the ALJ's decision from that 2000 claim appear in the Administrative Record before the Court. Plaintiff filed another application for benefits in 2001, which were granted until 2005 on an "extended period of eligibility in a trial work program." [R. 114-15.] Again, documents related to this extended grant of benefits do not appear in the Administrative Record before the Court.

After his benefits expired in 2005, Plaintiff again sought benefits from the SSA, filing for both SSI and disability insurance benefits ("DIB") in 2006. [R. 139.] After an Administrative Hearing [R. 113-34], Administrative Law Judge ("ALJ") John Kraybill issued an unfavorable February 12, 2008 decision after finding Plaintiff had the severe impairments of mental retardation [R. 139-45 at 141]. It is unclear whether Plaintiff appealed that decision.

In 2011, Plaintiff again applied for DIB. [R. 149.] After an Administrative Hearing [R. 86-110], ALJ Janice Bruning[4] issued an unfavorable June 10, 2013 decision after finding that Plaintiff had the severe impairments of history of hernia surgery, adjustment disorder, depression and anxiety, and developmental delay [R. 149-57 at 151]. It is unclear whether Plaintiff appealed that decision.

On August 7, 2014, Plaintiff again applied for both SSI and DIB. [R. 594.] The case was assigned to ALJ Edward Studzinski, who held an Administrative Hearing [R. 30-64] and subsequently issued an unfavorable decision after finding Plaintiff had the severe impairments of affective disorder, anxiety, and borderline intellectual functioning [R. 594-605 at 597]. Plaintiff appealed this decision and after filing

---

[4]    There is no SSA policy dictating that subsequent cases be assigned to the same ALJ as was familiar with and decided the case prior, although the SSA does try for some consistency in this regard upon remand. *See* HALLEX I-2-1-55, setting forth the SSA's internal guidelines for Assignment of Service Area Cases to Administrative Law Judges.

Plaintiff's brief, the Commissioner filed a motion for Reversal with Remand for Further Administrative Proceedings, which this Court granted on February 2, 2019. [R. 574-75.] The Court declined to reach the merits of Plaintiff's claims specifically because a motion to remand "obviate[d] the need for the Court to engage in an analysis of the ALJ's decision and to make rulings on the same." [R. 574.]

On March 20, 2019, the Appeals Council remanded the case and issued a 4-page order detailing a host of specifics the ALJ was to address upon remand. [R. 586-89.] Upon remand, Plaintiff's case was again assigned to ALJ Studzinski, who held another Administrative Hearing on August 28, 2019. [R. 518-59.] On November 1, 2019, ALJ Studzinski issued the unfavorable decision at issue before the Court. [R. 488-509.] Plaintiff "did not file exceptions to that decision and the Appeals Council did not assume [j]urisdiction of the ALJ's decision." [Dkt. 1, pp. 1-2.] Therefore after 60 days the ALJ's decision became the final decision of the Commissioner. C. F. R. § 404.984 (d). Plaintiff filed the instant action on February 20, 2020, seeking review of the Commissioner's decision. [Dkt. 1.]

### 1.2. Relevant Personal History

Plaintiff is a 46-year-old male. [R. 14.] Plaintiff has never lived independently.[5] [R. 38, 442.] Plaintiff lived with his parents until his father passed away in 2012. [R. 46, 442, 455]; Plaintiff continues to reside with his mother. [R. 49-50, 442.] Plaintiff has only had one romantic relationship in his life, and a child was born from that union in approximately 2006.[6] [R. 15, 442.] As of 2013, Plaintiff saw his child for one day every three months. [R. 95.] Plaintiff has limited social relationships outside of his family. [R. 18.] Plaintiff has some awareness (but not a full appreciation) of his cognitive and adaptive deficits and, as a result, expresses frustration, sadness, and confusion related to his desire to function with greater independence. [R. 19.] In addition to his cognitive deficits, Plaintiff maintains that his ability to function

---

[5]    The ALJ noted in his opinion that "[a]t a prior hearing on March 20, 2013, [Plaintiff] testified that he had lived by himself in a townhouse." [R. 492.] This is incorrect. Plaintiff testified he lived with his mother in a townhome. [R. 88.] Later, contradicting his earlier statement, the ALJ noted that Plaintiff "lived with his mother in a townhouse." [R. 497.]

[6]    Most documents within the Record indicate Plaintiff was not in a romantic relationship or are silent on this front, leading the Court to conclude this romantic relationship was short-lived.

severely eroded after the death of his father. [R. 15, 45-46, 339.]

Plaintiff began taking special education classes in 1st grade; Plaintiff graduated high school, while taking mostly special education classes throughout. [R. 14, 87, 104, 119-20, 442, 447, 832.] An IEP from Plaintiff's high school "indicated that academically [Plaintiff] did not progress past a 6th grade level in any academic subject and that his academic training was modified to…promote adaptive functioning"; he also received vocational training. [R. 15.]

Plaintiff's mother reports that Plaintiff does not need assistance with personal care and hygiene,[7] but has difficulty with financial management, navigating public transportation, and completing basic housework and home maintenance tasks. [R. 14, 18, 125, 190, 442, 812, 814.] Plaintiff is not responsible for paying any bills. [R. 535.] His mother needs to instruct him daily related to tasks at home, as Plaintiff forgets basic instructions from one day to the next, particularly if there are multiple steps to a task. [R. 105-06, 816.] Plaintiff's mother helps him out with his dishes and his cleaning, although Plaintiff occasionally helps with washing dishes, cleanup after meals, or straightening up around the house. [R. 50, 94, 442, 533, 812.] When Plaintiff attempts larger cleaning tasks (*e.g.*, cleaning of his bathroom), he is often not thorough with his cleaning, and his mother has to redo it. [R. 44-45, 101, 813-14.] Plaintiff is able to make sandwiches and occasionally do some basic cooking of simple meals (with some supervision), Plaintiff's mother often cooks for him; if Plaintiff is cooking, his mother has to remind him to turn off the stove after cooking. [R. 94, 100, 190, 442, 53, 813.] Although sometimes he washes his own clothes, Plaintiff's mother mostly does his laundry for him or helps him, as he sometimes gets confused about sorting it properly. [R. 95, 126, 190, 813.]

Plaintiff reports that he does not really read, as he doesn't understand certain things that he's read; he checks his email once every two months on a library computer, and does not use a computer for other purposes; Plaintiff only watches sports and the news when he watches television. [R. 96-97, 815.]

---

7    Although Plaintiff's mother reported that he sometimes forgets to rinse, leaving soap on himself after bathing. [R. 812-13.]

Plaintiff has a driver's license, but his father sat with him to help him take the written exam and to go over the questions with Plaintiff. [R. 533-34.] Plaintiff occasionally drives "only [to] certain things if [his] mom lets him." [R. 539.] It seems, in large part, that Plaintiff's mother drives him to the small handful of places he goes (*e.g.*, church, the gym, job interviews, to/from work when he has a job, the store for basic hygiene necessities, etc.) or is mostly in the car with him when he drives. [*See*, generally, transcripts from the various Administrative Hearings, R. 30-57, 86-107, 113-28, 518-541, 814.] At a certain point, Plaintiff's driver's license was suspended because he was behind in his child support because he was unable to make the payments with his sporadic job history. [R. 48-49.]

Plaintiff needed his mother's help in filling out at least one form in the Record, and one of his treating physicians filled out another form for him. [R. 386-93 (Work History Report filled out by mother); R. 416-22 (Disability Report-Appeal filled out by Dr. Baber).]

### 1.3. Plaintiff's Job History

Plaintiff's mother and father largely helped him find jobs. [R. 104.] It seems most of Plaintiff's jobs were very short term (*i.e.*, under a week) before he was let go for not being able to meet the demands of the position. However, there have been some jobs that Plaintiff has been able to hold for longer periods, but these positions allowed a generous amount of leeway for Plaintiff. At the 2016 Administrative Hearing, Plaintiff's counsel describes Plaintiff's work history as follows: "[Plaintiff] worked with the benefits of a fair amount of what we believe to be support or sympathy." [R. 33.]

As far as his early work history, in 1996-1997, Plaintiff worked as a runner for a trading firm at the Chicago Mercantile Exchange. [R. 355, 386.] In 1999 and 2000, Plaintiff worked doing security functions for Industrial Security Specialist. [R. 117-18.]

In approximately 2003-2005 and briefly again in 2007, Plaintiff worked seasonally (June to October) at Arlington Park Racecourse. [R. 118, 357-58, 386, 524, 526.] His first two seasons, Plaintiff worked three days a week doing traffic detail, letting cars go by and then horses. [R. 40, 524, 527.] Plaintiff reports

5

there was a security supervisor who would monitor Plaintiff to ensure he was doing his job properly. [R. 536-37.] His last season, Plaintiff worked five days a week at a job in horse security.[8] [R. 524-25, 528.] Plaintiff reports always having someone helping him with the functions of this horse security position, making sure he was witnessing and recording horse injections properly. [R. 124-25, 524-25, 528-29.] After Plaintiff's helper passed away, another individual was assigned to help Plaintiff for the remainder for the season, but Plaintiff never got called back to work at the racetrack in subsequent seasons. [R. 529-30.]

Plaintiff has also held several low-level security-guard-type jobs. For a month in 2007, Plaintiff reports working at Capital Security as a security guard who would do office checks and check people's IDs. [R. 386, 390.] In 2008, Plaintiff worked at a car dealership as a security guard, whose functions included checking locks and gates and doors to ensure they were secure, pointing a laser wand at a check-in point every hour to ensure his tasks were being completed. [R. 116-17.] While Plaintiff was at this job, there was an incident where another employee brought a gun to work and left it on his own chair unattended, and it was later determined the individual entered through a door Plaintiff had left unlocked when it shouldn't have been. [R. 122-24.] After Plaintiff was questioned by his employer about this incident, he wasn't written up, but he was admonished to keep a closer eye on what he was doing so no similar incidents would happen in the future. [R. 127.] Also in 2008, Plaintiff reports working for a month as a security guard at the Charles Town Mall, where he would "walk the mall, stamp the place you went to." [R. 368, 389.] Similarly, in 2009-2010, Plaintiff worked at the Schaumburg Township District Library in security, which entailed walking around and telling patrons to be quiet, as well as locking/unlocking doors. [R. 94, 359, 386, 388.] At some point, Plaintiff worked one day per week at US Security Associates, where he had difficulties with the locks and writing reports in military time. [R. 523.]

Plaintiff reports that he has tried a handful of jobs in physical labor, including bricklayer, but he was always let go (usually within a week) because he was not fast enough. [R. 119, 386.] Plaintiff has had

---

[8]   From what the Court can gather, it seems this job was one witnessing a doctor give injections to horses and recording the same to prevent cheating. [R. 524-25, 545.]

short-term factory work, but was unable to accurately put parts inside a hole on an assembly line. [R. 538-39.] In 2013, Plaintiff reports briefly working doing inventory control, but he had problems matching up numbers and was let go because he accidentally let a truck go past without checking it. [R. 43-44.] In 2014, Plaintiff worked for four days at a warehouse job where he was let go because he could not accurately load and unload boxes onto a skid. [42-43.] In another similarly short gig at a different warehouse, Plaintiff was unable to drive a forklift. [R. 43.] Plaintiff trained for three or four days at a grocery store in 2015, learning to weigh food in the kitchen, before he was let go. [R. 414.] In June of 2019, Plaintiff had a position at Home Depot for two days; Home Depot let him know he was "not learning fast enough" and not meeting the demands of the job in working on displays and finding correct items/numbers for items. [R. 521-22, 887, 889.]

The earnings records generated by the SSA bear out that most jobs held by Plaintiff were indeed short term and low-paying. [R. 354-71.] A 2016 earnings report includes the following data on Plaintiff's lifetime earnings:

**SUMMARY FICA EARNINGS FOR YEARS REQUESTED**

| YEAR | EARNINGS | YEAR | EARNINGS | YEAR | EARNINGS | YEAR | EARNINGS |
|------|----------|------|----------|------|----------|------|----------|
| 1992 | .00 | 1999 | 17186.75 | 2005 | 8231.80 | 2011 | 1311.75 |
| 1993 | 74.60 | 2000 | 10314.60 | 2006 | 7256.21 | 2012 | .00 |
| 1994 | 150.04 | 2001 | 5495.05 | 2007 | 11677.68 | 2013 | 1298.80 |
| 1995 | 1793.33 | 2002 | 6716.75 | 2008 | 11645.45 | 2014 | 622.68 |
| 1996 | 5198.57 | 2003 | 7940.00 | 2009 | .00 | 2015 | 479.18 |
| 1997 | 3506.64 | 2004 | 8781.28 | 2010 | 364.50 | 2016 | .00 |
| 1998 | 5221.64 | | | | | | |

[R. 371.] The Record further indicates Plaintiff earned $109.00 in 2017; $1,668.00 in 2018, and $0 in 2019, the last year for which there is data in the Record. [R. 801-09 (report run July 29, 2019).]

### 1.4. Relevant Medical Background

#### (2001) - Dr. Gregory Rudolph

On August 28, 2001, Dr. Gregory Rudolph, PhD, Licensed Clinical Psychologist, examined Plaintiff at the request of the SSA. [R. 447.] Dr. Rudolph issued a September 4, 2001 report opining that

Plaintiff had a full scale IQ of 62, indicating mildly mental handicap. [R. 190, 448.] Dr. Rudolph also opined that Plaintiff "**is not capable** of managing his own financial resources." [R. 449 (emphasis in original).]

### (2012) - Dr. Sayaka Machizawa

In late October 2012, Plaintiff was sent by the Illinois Department of Human Services to Dr. Sayaka Machizawa, Psy.D., Licensed Clinical Psychologist, for a neuropsychological evaluation. [R. 441.] Dr. Machizawa evaluated Plaintiff over two sessions, and issued her report on October 30, 2012. [R. 441-45.] That report indicated, *inter alia*, that Plaintiff "had difficulty providing a detailed personal history." [R. 442.] Dr. Machizawa found that when Plaintiff "encountered challenging tasks, he would not persist," despite putting forth adequate effort during testing. [R. 442.] Performance on the Weschler Abbreviated Scale of Intelligence (WSAI) "falls in the extremely low range of intelligence for a person his age." [R. 443.] Plaintiff's responses on the vocabulary subtest "tended to be markedly concrete and he appeared to have difficulty explaining abstract concepts."[9] With respect to Plaintiff's "academically related skills, his overall performance is below the expected level for his age and educational background." [*Id.*] On the Repeatable Battery for the Assessment of Neuropsychological Status (RBANS), Plaintiff's "overall score falls in the severely impaired range (below 0.1st percentile). His performance on immediate memory, delayed memory, visuospatial construction, language, and attention was at or below the 0.1st percentile for a person his age in the normative group." [R. 443-44.]

Dr. Machizawa also screened Plaintiff for depression, and the results indicated minimal depression and insomnia of moderate severity. [R. 444.] Plaintiff reported "feelings of sadness, pessimism, loss of pleasure, lack of confidence, self-criticalness, loss of interest, low self-esteem, and irritability." [R. 444.] Dr. Machizawa opined Plaintiff had an Axis I – R/O Adjustment Disorder, and an Axis II – Mild Mental

---

[9]   "For example, when [Plaintiff] was asked to define the word 'number' he answered, "Like 1, 2, 3, 4…" When he was asked to explain the meaning of the word 'lunch,' he responded, "Lunch is when you go out to eat."" [R. 443.]

Retardation. [R. 190, 444-45.]

Dr. Machizawa further opined that Plaintiff:

> seems to have clinically significant cognitive difficulties across different domains. His
> cognitive deficits seem to be severe to the degree that they are likely to interfere with his
> ability to live independently, He also seems to have significant limitations in adaptive
> behavior such as daily living skills (*e.g.*, managing money, safety procedures, emergency
> responses) and communication skills. Nevertheless, given his motivation to work,
> cooperativeness, and physical strength, he seems to be a good candidate for full-time or
> part-time competitive employment.

[R. 445.] Dr. Machizawa recommended that Plaintiff "receive support from a job coach at least in the

beginning of the job placement until he becomes able to perform the job independently." [*Id.*]

### (2014) - Dr. Shannon Doyle

Consultative clinical psychologist Dr Shannon S. Doyle, PhD, completed an October 6, 2014

Mental Capacity Assessment ("MCA") on Plaintiff. [R. 190, 200, 438.] Although Plaintiff affirmatively

self-reported being able to manage his own funds, Dr. Doyle's mere 55-minute assessment of Plaintiff

led her to conclude that "[i]n my opinion, this claimant is not capable of handling his own financial

affairs." [R. 438-39.]

### (2015) – Dr. Michael E. Cremerius

State agency psychological consultant Dr. Michael E. Cremerius Ph.D., reviewed Plaintiff's file on

February 17, 2015. [R. 210-24.] Dr. Cremerius opined that Plaintiff was moderately limited in his ability

to: remember locations and work-like procedures; understand, remember, and carry out very short and

simple instructions; sustain an ordinary routine without special supervision; work in coordination with or

in proximity to others without being distracted by them; interact appropriately with the general public;

respond appropriately to changes in work settings. [R. 201-24, 504, 828.]

### (2015-2016) - Dr. Laura Baber

Plaintiff began seeing Dr. Laura E. Baber, MD in June of 2015 as his primary care provider, and

saw her every 3 months thereafter for the next year. [R. 421, 450-52, 417.] Progress notes in the Record

indicate that Plaintiff continues to see Dr Baber as his primary care physician on an approximately yearly basis. [R. 839-57.]

On September 27, 2015, Dr. Baber filled out Plaintiff's Disability Report-Appeal for him. [R. 416-22.] In that document, Dr. Baber opined that Plaintiff

> has a limited IQ; he was born with this cognitive limitation/impairment. He can learn simple tasks but is not able to work on his own or take on significant responsibility. Therefore, he has problems working by himself and taking full responsibility. Also he has been let go from all his previous jobs because he frequently forgets his tasks or responsibilities. [Plaintiff] also cannot manage his own finances – his mother and older brother have to care for him.

[R. 421.]

Similarly, in July 2016 Dr. Baber completed a Mental Impairment Questionnaire opining on Plaintiff's impairments. [R. 450-52.] Dr. Baber opined that Plaintiff had "poor social skills; cannot make decisions by himself." [*Id.*] Dr. Baber noted that Plaintiff had an avoidant personality disorder. [R. 426, 450.] Dr. Baber indicated that Plaintiff had poor to no ability to maintain attention for two hour segments; make simple work related decisions; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavior of extremes; respond appropriately to changes in a routine work setting; or to otherwise deal with normal work stress. [R. 451.] Dr. Baber explained that she felt Plaintiff had "poor to no ability" in the above categories because "due to mental, emotional limitations, patient cannot act alone, by self or with others in a work environment." [*Id.*] Finally, Dr. Baber opined that Plaintiff had extreme difficulties in maintaining social functioning; that he had constant deficiencies in concentration, persistence, or pace resulting in failure to complete tasks in a timely manner; that he would have continual episodes of deterioration or decompensation in a work-like setting that would cause him to withdraw from that situation or experience an exacerbation of signs and symptoms; and that he was moderately limited in activities of daily living. [R. 452.]

Aside from these two reports, Dr. Baber's 2015-2019 progress notes are largely unremarkable, aside from continually affirming Dr. Baber's diagnoses of Mild Intellectual Disability, Avoidant Personality Disorder. [R. 458-83, 839-57.] Of note, however, in August 2015, Dr. Baber provided Plaintiff a referral to mental health because he was having a hard time dealing with his father's death. [R. 463.] Concurrently, Dr. Baber diagnosed Plaintiff with Anxiety Disorder (unspecified). [R. 464.]

### (2016) - Dr. Michael Sims

On March 3, 2016, Plaintiff underwent a psychiatric evaluation by Dr. Michael T. Sims, MD, in the emergency department at Advocate Sherman Hospital. [R. 455-56.] During that evaluation, Dr. Sims was informed by Plaintiff's mother that Plaintiff's father had passed away from cancer 4 years ago and that she felt Plaintiff never fully recovered from this and had been depressed. [R. 455.] Dr. Sims ultimately opined that "[b]ased on history I believe patient has been suffering depression the past 4 years…" [R. 456.] Plaintiff was not admitted to the hospital as Dr. Sims felt his depression was not an acute episode. [*Id.*]

### (2016) - Dr. Annmarie Belmonte

Pursuant to Dr. Baber's referral to mental health services, Plaintiff began to be treated in weekly outpatient individual therapy at Alexian Brothers Behavioral Health Hospital. [R. 484.] On August 1, 2016, Dr. Annmarie Belmonte, Psy.D. (Clinical Supervisor) and Simone Jalon, M.A. (Doctoral Psychology Intern) diagnosed Plaintiff with Major Depressive Disorder, moderate, recurrent. [*Id.*]

### (2017) - Dr. Israel Gross

In June of 2017, after evaluating Plaintiff on three occasions in the months preceding his report, Dr. Israel Gross, PhD, a clinical neuropsychologist and licensed clinical psychologist at Stroger Hospital of Cook County issued a Neuropsychological Consultation Report. [R. 14-20.] During Dr. Gross's evaluative sessions, Dr. Gross administered the following tests to Plaintiff: The Beck Anxiety Inventory (BAI); Beck Depression Scale – Second Edition (BDI-II); Delis-Kaplan Executive Function System

(SKEFS, Tower); RBANS – Form A; Test of Memory and Malingering (TOMM); Trail Making Tests A &B; Vineland Adaptive Behavior Scales – 2nd edition (Selected Domains); Weschler Adult Intelligence Scale – Fourth Edition (WAIS-IV); Wide Range Achievement Test – 4 (WRAT-4, Word Reading & Math Subtests). [R. 16.]

In summary, the results of those tests indicated: Plaintiff's overall "cognitive abilities are within the borderline to profoundly impaired range," with most metrices ending up lower than the 1st percentile. [R. 16, 18.] He scored in the 1st percentile or less in verbal comprehension and expression, visuoperceptual and visual-spatial reasoning, as well as tasks requiring mental manipulation of auditory information; he scored in the 3rd percentile for mental and motor processing speed. [R. 16.] In basic attentional abilities, Plaintiff exhibited "low-average to average" ability; when the task required "greater levels of working memory and mental manipulation," Plaintiff's "abilities were limited and within the borderline to moderately impaired range;" Plaintiff "demonstrated notable difficulty and [was] within the profoundly impaired range on executive functioning tasks with greater complexity and with an emphasis on problem solving." [*Id.*] Plaintiff's performance on language tasks was variable, ranging from profoundly impaired to extremely low ability to average. [*Id.*] With respect to visuospatial functioning/visual memory, "[o]n a task of distinguishing varying angles and spatial orientation he performed in the moderately impaired range," as well as "demonstrated profoundly impaired ability to register and encode a complex geometric figure." [R. 17.] Overall, Plaintiff "demonstrated notable impairment across verbal and visual modalities for both the registering and encoding of information, as well as the ability to freely recall previous information learned." [*Id.*] Plaintiff was able to read at a grade equivalent of a fifth grader and do math at a grade equivalent of kindergarten. [*Id.*] Plaintiff demonstrated "notable impairment" in the area of daily living skills, with ratings at an age equivalent of a 12-year-old in the area of personal care; a 10-year-old in domestic care; an 8.9-year-old in community engagement; and an 8.4-year-old in the area of interpersonal relationships. [R. 17-18.]

Dr. Gross opined that although Plaintiff "exhibited some mild variability among cognitive indices, his overall score [FSIQ = 59, <1st percentile] is thought to be a meaningful indicator of [his] true cognitive abilities." [R. 16.] Ultimately, based on these findings, Dr. Gross found that "a DSM-V diagnosis of Intellectual Disability (317), likely mild in severity is warranted." [R. 19.] Dr. Gross also found that Plaintiff's superficial awareness of his deficits combined with his "frustration, sadness, and some confusion related to his desire to function with greater independence" resulted in some depressive symptoms, leading Dr. Gross to find that "an additional DSM-V diagnosis of Depressive Disorder (311) with insufficient symptoms for a major depressive disorder is warranted." [*Id.*]

Dr. Gross noted that, at times during these initial exam sessions, Plaintiff "seemed somewhat confused and [Dr. Gross] had to explain information using basic terminology." [R. 15.] Dr. Gross also found that "given [Plaintiff's] cognitive and adaptive deficits, he will likely need substantial support throughout his life in the areas of independent living, medical and financial decision making, and maintaining employment that will allow him to provide adequate financial support for himself. With that said, [Plaintiff] is encouraged to seek out vocational opportunities at a level consistent with his cognitive level." [R. 19.] "In particular, [Plaintiff] would benefit from some vocational training that may allow him to obtain part-time employment at the level of his cognitive functioning." [*Id.*] Finally, Dr. Gross noted that Plaintiff "and his family should discuss assigning a family member, or other trusted individual as a power of attorney for medical and financial decisions, as [Plaintiff's] cognitive deficits may limit his abilities to make complex decisions in his best interest. In addition, long-term [Plaintiff] and his family may want to think about a residential plan for [Plaintiff] if he is no longer able to live under the supervision of his mother." [R. 20.]

After his initial evaluative sessions and Neuropsychological Consultation Report, Dr. Gross became Plaintiff's treating psychologist in August of 2018, with appointments scheduled on a monthly or twice-monthly basis through at least July of 2019, the latest date for which the Court has records. [R. 864-90.]

Plaintiff began seeing Dr. Gross in 2018 "to address depressive symptoms, as well as difficulties associated with his Mild Intellectual Disability." [R. 867.] At that time, Plaintiff "reported an increase in depressive symptoms over the past several months. Namely he reported feeling hopeless about the future, sad mood, loneliness, and frustration related to not being able to find a vocational program." [*Id.*] Dr. Gross also noted on many occasions that Plaintiff "struggles with loneliness and a strong desire to be engaged in the world, via a vocation or friendship." [R. 870, 872, 874, 876, 878, 881, 883, 885, 887, 890.] Throughout 2018 and into April of 2019, Plaintiff reported troubles connecting with a vocational training program or similar program for individuals with an intellectual disability, so much so that on April 3, 2019, Dr. Gross himself even spent 45 minutes reaching out to programs with adult day programs for individuals with developmental disabilities on behalf of Plaintiff. [R. 868-884.] During sessions with Dr. Gross, Plaintiff also discussed the passing of his father and the impact this has had on him. [R. 869, 877.]

### 1.5. The Operative ALJ Decision

On November 1, 2019, ALJ Studzinski issued the most recent written decision denying Plaintiff disability benefits. [R. 488-509.] At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of June 10, 2013. [R. 491.] At Step Two, the ALJ found that Plaintiff had the severe impairments of an affective disorder, anxiety, and borderline intellectual functioning. [R. 491-92.] As part of his Step Two decision, while not specifically labeling it a nonsevere impairment, the ALJ noted that "mental retardation has not caused any work-related functional limitations that lasted for a period of 12 months.[10] [R. 492.] At Step Three, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments of 20 C.F.R. Part 404, Subpart P, App'x 1. [R. 492-96.]

Before Step Four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to

---

[10]    Effectively, however, the ALJ did classify this as a nonsevere impairment, as an impairment is nonsevere if it is a slight abnormality or a combination of slight abnormalities that cause no more than minimal functional limitations (*i.e.*, it does not significantly limit your physical or mental abilities to do basic work activities). 20 C.F.R. § 416.924(c).

perform work at all exertional levels with the following limitations: he can never climb ladders, ropes, or scaffolds; he is limited to working in non-hazardous environments (*i.e.*, no driving at work, operating moving machinery, working at unprotected heights or around exposed flames and unguarded hazardous machinery); he is limited to simple, routine tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment; he can work only at an average production pace; he cannot work in direct public service, in person or over the phone, although he can tolerate brief and superficial interaction with the public incidental to his job duties; he is unable to work in crowded, hectic environments; he can tolerate brief, superficial interaction with supervisors and co-workers, but is not to engage in tandem tasks; and he is not capable of work requiring complex written or verbal communication. [R. 497-507.]

At Step Four, the ALJ determined Plaintiff was unable to perform any past relevant work as a security guard. [R. 507.] At Step Five, the ALJ found there were jobs that existed in significant numbers in the national economy Plaintiff could perform. [R 21-25.] Specifically, the ALJ relied upon testimony from vocational expert ("VE") Lee Knutson in concluding that Plaintiff could perform in a cleaner position (DOT #381.687-018) or a sorter position (DOT #609.685-010), each having an SVP of 2.[11] The ALJ also relied on Mr. Knutson in concluding that Plaintiff could perform in a Cleaner II position (DOT #919.687-014) which has an SVP of 1. [R. 507-08.] Because of these determinations, the ALJ found Plaintiff not disabled under the Act. [R. 508-09.]

## 2. Social Security Regulations and Standard of Review

In disability insurance benefits cases, a court's scope of review is limited to deciding whether the final decision of the Commissioner of Social Security is based upon substantial evidence and the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence exists when a

---

[11]    To determine the skill level of an individual's past jobs, the Social Security Administration ("SSA") uses the Specific Vocational Preparation ("SVP") rating system. SVP ratings indicate how long it takes a worker to learn how to do his or her job at an average performance level. *See Dictionary of Occupational Titles*, Appendix C: Components of the Definition Trailer, II (SVP) (4th Ed., Rev. 1991).

"reasonable mind might accept [the evidence] as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). While reviewing a commissioner's decision, the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and her conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citation omitted). The Court cannot let the Commissioner's decision stand if the decision lacks sufficient evidentiary support, an adequate discussion of the issues, or is undermined by legal error. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

**3.    Discussion**

Social Security regulations direct an ALJ to evaluate each medical opinion in the record. 20 C.F.R. § 416.927(c). Because of a treating physician's greater familiarity with the claimant's condition and the progression of his impairments, the opinion of a claimant's treating physician is entitled to controlling weight as long as it is supported by medical findings and is not inconsistent with other substantial evidence in the record.[12] 20 C.F.R. § 416.927(c)(2); *Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016); *Clifford v. Apfel*, 227 F.3d at 870. An ALJ must provide "good reasons" for how much weight he gives to a treating source's medical opinion. *See Collins v. Astrue*, 324 Fed. Appx. 516, 520 (7th Cir. 2009); 20 C.F.R. § 416.927(c)(2) ("We will always give good reasons in our…decisions for the weight we give your treating source's opinion."). When an ALJ decides for "good reasons" not to give controlling weight to a treating physician's opinion, he must determine what weight to give to it and other available medical opinions in

---

[12]    This regulation regarding the weighing of opinion evidence, commonly known as the "treating physician rule," has since been eliminated for new claims filed on or after March 27, 2017. *Revisions to Rules Regarding the Evaluation of Medical Evidence,* 82 Fed. Reg. 5844, 5848-49 (Jan. 18, 2017) (codified at 20 C.F.R. pts. 404 and 416). For the purposes of this appeal, however, the prior version of the regulation applies, as Plaintiff's application dates back to 2014. *See* Section 1.1, *supra*, Procedural History.

accordance with a series of factors, including the length, nature, and extent of any treatment relationship; the frequency of examination; the physician's specialty; the supportability of the opinion; and the consistency of the physician's opinion with the record as a whole. *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); see 20 C.F.R. § 416.927(c)(2)-(6). An ALJ must provide "sound explanation" for the weight he gives each opinion. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). If he does not discuss each factor explicitly, the ALJ should demonstrate that he is aware of and has considered the relevant factors. *Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013).

Plaintiff alleges the ALJ erred, *inter alia*, in weighing the medical opinions of two treating physicians (*i.e.*, Dr. Gross and Dr. Machizawa) in this matter.[13] The Court agrees.

### 3.1. The ALJ Erred in Weighing Dr. Gross's Opinions

The Court does not believe the ALJ articulated "good reasons" for not giving controlling weight to Dr. Gross's opinions. In his decision, the ALJ afforded Dr. Gross's opinions "no substantial weight"[14] and found his assessment "generally unpersuasive." [R. 506.] The reasons the ALJ gave for assigning this weight is that Dr. Gross's assessment "is inconsistent with and not supported by mental status examinations or the claimant's daily activities including driving and working in the past." [R. 506.]

Initially, it appears the ALJ incorrectly compares and equates Dr. Gross's neuropsychological examination results with the mental status examinations ("MSEs") from other treaters and examiners in the record. However, the two are not equivalent, and it is an error for the ALJ to have discounted Dr. Gross's opinions stemming from neuropsychological testing in favor of the MSEs of record. Dr. Gross's opinion was supported by neuropsychological examinations, which test very discrete areas of functioning – verbal comprehension and expression, visuoperceptual and visual-spatial reasoning, mental

---

[13]  The Court offers no opinion as to the other alleged bases of error in the ALJ's decision as raised by Plaintiff other than those discussed herein.

[14]  Not only does the Court find this terminology vague in meaning concerning exactly how much weight has been given to Dr. Gross's opinions, but this terminology is also uncommon. A Westlaw search for any other Social Security case within the Seventh Circuit where "no substantial weight" has been assigned to a physician opinion yields not a single case.

manipulation of auditory information, mental and motor processing speed, psychomotor processing speed, and visual confrontation. [R. 16-17.] The National Academy of Neuropsychology has explained neuropsychological evaluations as follows:

> A neuropsychological examination is one of the methods of diagnosing neurodevelopmental, neurodegenerative, and acquired disorders of brain function…The purpose of the neuropsychological examination is to assess the clinical relationship between the brain/central nervous system and cognitive/behavioral dysfunction, as well as to participate in differential diagnosis. It is a neurodiagnostic, consultative service, and not a mental health evaluation or treatment service…The evaluation is performed by a qualified neuropsychologist who has undergone specialized education and intensive training in the clinical neurosciences, including the relationship between behavioral functioning and neuroanatomy, neurology, and neurophysiology…A typical neuropsychological evaluation entails the taking of an extensive history (including review of medical records), and the administration of a screening assessment or a comprehensive evaluation that can take 8 or more hours and requires intensive data analysis.

Rosenstein, Leslie D., Ph.D., ABPP-CN, release re neuropsychological neurodiagnostic examinations, National Academy of Neuropsychology, https://tinyurl.com/33set2u3 (last accessed August 5, 2021). Neuropsychological testing is "highly detailed and time-consuming." Norris, David R, MD, et al., *The Mental Status Examination*, American Family Physician (October 15, 2016) 4(8): 635-641.

On the other hand, a mental status examination is a much less involved tool geared toward mental health rather than the functioning of the brain:

> The mental status examination is an essential tool that aids physicians in making psychiatric diagnoses…The mental status examination can help distinguish between mood disorders, thought disorders, and cognitive impairment, and it can guide appropriate diagnostic testing and referral to a psychiatrist or other mental health professional.

Snyderman, Danielle, MD, Rovner, Barry W., MD, *Mental Status Examination in Primary Care: A Review*, American Family Physician (Oct. 15, 2009 issue) 80(8): 809-814; *see, also, Adams v. Comm'r of Soc. Sec. Admin.*, 2019 WL 2503935, at \*5 (D. Alaska June 17, 2019) (patient can have significant limitations seemingly despite normal mental status exams because "the mental status exam in psychiatry paints a pretty low bar.") An MSE can consist of one or more of "several brief screening tools [that] can assist physicians in obtaining an objective assessment of mental status" – of the most common tests, the "mini-

cog" takes 5 minutes or less to administer; the MMSE takes 6-10 minutes to administer; the Montreal Cognitive Assessment takes 10 minutes or less to administer; and the ACE-R takes about 20 minutes to administer. Norris, David R, MD, et al., *The Mental Status Examination*, American Family Physician (October 15, 2016) 4(8): 635-641.

The ALJ falsely equated MSEs and neuropsychological evaluations. [R. 506.] The ALJ did not explain *why* he felt the MSEs were more probative than the results of the more comprehensive neuropsychological testing, and the Court is not convinced that such an apples-to-oranges comparison could ever be useful as these tests measure different metrics anyhow. In any case, it is fair to say ALJ did not even "explain" the neuropsychological results, as he merely summarized them earlier in his decision, and "the act of summarizing the evidence is not the equivalent of providing an analysis of the evidence." *Perry v. Colvin*, 945 F. Supp. 2d 949, 965 (N.D. Ill. 2013). Moreover, the Court finds no disconnect between Plaintiff's low intelligence results during neuropsychological testing, and his largely normal results during mental health screenings as part of MSEs.[15] The ALJ's finding that mental status examinations, by themselves, could negate an otherwise sound neuropsychological examination was nothing more than the ALJ's (incorrect) lay opinion. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014), as amended on denial of reh'g (Oct. 24, 2014) ("ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves.") Simply, the ALJ's assessment that Dr. Gross's opinions are inconsistent with the MSEs is unsupported and wrong.

Next, the ALJ discounted Dr. Gross's opinions as "inconsistent with and not supported by...the claimant's daily activities including driving and working in the past." [R. 506.] The Seventh Circuit has consistently cautioned ALJs to not place "undue weight" on a claimant's daily household activities in evaluating the claimant's ability to perform work outside the home. *Moss*, 555 F.3d at 562; *see, also, Spiva*

---

[15]    A particularly egregious example of this type of false equivalence on the part of the ALJ is when he found Plaintiff made inconsistent statements about his mental health because "he denied any history of psychiatric symptoms yet stated that he had to hear something four or five times until he understood." [R. 499.] Simply and generally put, Plaintiff is a person of low intelligence, not one who is suffering an acute mental health crisis.

*v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010); *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) (a claimant's "ability to struggle through the activities of daily living ["ADLs"] does not mean that she can manage the requirements of a modern workplace"). While an ALJ can consider a claimant's daily activities in his subjective symptom analysis, his evaluation "must be done with care" because these abilities say little about how Plaintiff could manage the requirements of the workplace. *Roddy*, 705 F.3d at 639; *Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016); *Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir. 2012)). "The failure to recognize the[] differences [between ADLs and activities in a full-time job] is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases." *Bjornson*, 671 F.3d at 647. Here, the ALJ seemingly ignores the difficulties Plaintiff experiences when he performs these basic activities.[16] *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (finding error when the "ALJ ignored [claimant's] qualifications as to *how* [s]he carried out" daily activities) (emphasis in original).

There is no reason (nor has the ALJ given one) to mistrust the findings of Dr Gross related to his assessment of Plaintiff's daily living skills. Specifically, Dr. Gross found that Plaintiff demonstrated "notable impairment" in the area of daily living skills, with ratings at an age equivalent of a 12-year-old in the area of personal care; a 10-year-old in domestic care; an 8.9-year-old in community engagement; and an 8.4-year-old in the area of interpersonal relationships.[17] [R. 17-18.] Moreover, the ALJ has not detailed which of Dr. Gross's findings are allegedly inconsistent with/not supported by which of Plaintiff's ADLs. Nonetheless, the Court now addresses problems with the ALJ's opinion on these points.

While the ALJ found that Plaintiff "is able to take care of personal hygiene independently and appeared at consultative examinations in clean and appropriate clothing" [R. 492], the ALJ ignored the

---

[16]  Tangentially, the Court also notes the ALJ seemingly ignored the difficulties Plaintiff had testifying at the four administrative hearings in the Record. While the ALJ found Plaintiff was "able to provide meaningful testimony," the Court would use wholly different wording to describe the testimony reflecting an individual who had difficulty fully, clearly, concisely answering the questions posed to him; struggled to stay on topic; and often had to be redirected or asked follow-up clarifying questions by the ALJ or his counsel. [*See* R. 30-57, 86-107, 113-28, 518-541, 814.]

[17]  For comparison, under Illinois statute, anyone under 14 is not even be allowed to babysit a child 0-13 years of age. 720 ILCS 5/12C-10(a).

fact that while Plaintiff is largely able to take care of his own personal hygiene, his mother reported that Plaintiff sometimes forgets to rinse, leaving soap on himself after bathing. [R. 812-13.] While the ALJ found that Plaintiff's mother "provided reminders for him to…manage his laundry neatly" [R. 497], this somewhat mischaracterizes the multiple mentions in the record that while Plaintiff sometimes he washes his own clothes, his mother mostly does his laundry for him or helps him. [R. 95, 126, 190, 813.] While the ALJ found that Plaintiff was able to clean his room [R. 497], the ALJ ignored the fact that when Plaintiff attempts larger cleaning tasks (*e.g.*, cleaning of his bathroom), he is not thorough with his cleaning, and his mother has to redo it.[18] [R. 44-45, 101, 813-14.] The ALJ wholly omitted mention of Plaintiff's difficulties in preparing his own food; even if Plaintiff is cooking basic meals with supervision, his mother has to remind him to turn off the stove after cooking and not to let his oatmeal overflow in the microwave. [R. 94, 100, 105-06, 190, 442, 53, 813.]

While Plaintiff is indeed able to drive, the ALJ ignored the fact that his father sat with him to help him take the written exam and to go over the questions with him. [R. 533-34.] Moreover, while the ALJ makes much of Plaintiff's ability to drive (particularly to the gym 45 minutes away), the Record reflects that Plaintiff occasionally drives "only [to] certain things if [his] mom lets him" [R. 539] and that Plaintiff's mother is, in large part, driving Plaintiff around (to church, the gym, job interviews, to/from work, to the store) or in the car with him when he drives to these places. [*See* R. 30-57, 86-107, 113-28, 518-541, 814.] The Court finds the ALJ makes too much of Plaintiff's ability to occasionally independently drive, particularly given the evidence of Record above. Additionally, under the maxim that an ALJ cannot "play doctor," an ALJ is not even qualified to make the determination that claimants who are capable of driving cannot have severe mental impairments. *Wichelman v. Berryhill*, 2019 WL 2353462, at *4 (W.D. Wis. June 4, 2019). And like the other ADLs discussed, *supra*, the Court cannot determine which of Dr. Gross's

---

[18] The Court is further confounded by this omission in particular because (a) the ALJ afforded Plaintiff's mother's accounts of his ADLs some weight and found them consistent with Plaintiff's ability to work [R. 506] when they really appear to describe the opposite; and (b) two of the three jobs available in the national economy the ALJ determined Plaintiff would be able to perform were cleaning jobs [R. 508], which Plaintiff seems particularly ill-suited for.

opinions were allegedly inconsistent with Plaintiff's limited driving activities.

As to Plaintiff's ability to work in the past as indicative (or not) of his disability status, while an ALJ is entitled to consider a claimant's past work history, *see Lafayette v. Berryhill*, 743 F. App'x 697, 699-700 (7th Cir. 2018), the Seventh Circuit has also "recognized that even persons who *are* disabled sometimes cope with their impairments and continue working long after they might have been entitled to benefits." *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (emphasis in original); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003) ("[a] desperate person might force himself to work despite an illness that everyone agreed was totally disabling…[a] disabled person should not be punished for heroic efforts to work."). Moreover, case law suggests it is important to look at the jobs themselves and how they are performed by the claimant to determine whether this logically supports a finding that the claimant could sustain full time work. *See Pierce v. Colvin*, 739 F.3d 1046, 1050-51 (7th Cir. 2014) ("a claimant's dogged efforts to work beyond [] capacity [are] highly relevant" but "an occasional six-hour day is a far cry from full-time work day-in and day-out.").

In the instant matter, it seems most jobs Plaintiff held provided him specifically a generous amount of leeway or, as counsel has described it, "a fair amount of what we believe to be support or sympathy." [R. 33.] Specifically, in one of his longest-held positions, Plaintiff was constantly monitored by another worker to ensure he was performing his job functions properly (*i.e.,* he had someone watching him as he did traffic detail at the racetrack and had a monitor when he did the horse security position [R. 124-25, 524-25, 528-29, 536-37]), and in another longer-term position, it seems Plaintiff may not have been disciplined in a manner commensurate with a mistake he made (*i.e.,* Plaintiff was not fired from – but told to be more careful – in his position ensuring certain doors were locked in a car dealership despite someone bringing in a gun through a door Plaintiff had left unlocked [R. 127]). Not only do Plaintiff's past jobs lend little logical support to the idea that Plaintiff can sustain a full-time position with no assistance, but Plaintiff's past work is not in conflict with Dr. Gross's opinion that Plaintiff seek out

employment in the future.

Dr. Gross opined the following:

> given [Plaintiff's] cognitive and adaptive deficits, he will likely need substantial support throughout his life in the areas of independent living, medical and financial decision making, and maintaining employment that will allow him to provide adequate financial support for himself. With that said, [Plaintiff] is encouraged to seek out vocational opportunities at a level consistent with his cognitive level…In particular, [Plaintiff] would benefit from some vocational training that may allow him to obtain part-time employment at the level of his cognitive functioning.

[R. 19.] It is clear Dr. Gross thought part-time employment *may* be a future possibility for Plaintiff (with vocational training), but Dr. Gross did not opine on whether he thought Plaintiff would be able to sustain a full-time position (with or without assistance). Dr. Gross twice emphasizes that it is Plaintiff's cognitive abilities that need to be taken into consideration, which seems to comport with the latitude several of his past jobs allowed him (presumably due to his impaired cognitive abilities). The Court cannot follow any logical bridge from Dr. Gross's opinions to the ALJ's erroneous conclusion that these opinions are "inconsistent with and not supported by…the claimant's…working in the past." [R. 506.]

The Court cannot uphold the ALJ's decision based on the ALJ's faulty assessment of Dr. Gross's opinions.

### 3.2. The ALJ Erred in Weighing Dr. Machizawa's Opinions

Similarly, the Court does not believe the ALJ articulated "good reasons" for not giving controlling weight to Dr. Machizawa's opinions. In his decision, the ALJ afforded Dr. Machizawa's opinions "limited weight." [R. 504.] The ALJ found Dr. Machizawa'a assessment that Plaintiff was a good candidate for competitive employment was consistent with and supported by the "overall record" as well as Plaintiff's ability to perform work in the past, but the ALJ was "not persuaded that the claimant needs a job coach in order to perform jobs within the parameters of the [RFC]." [R. 504-05.]

Dr. Sayaka Machizawa, Psy.D., Licensed Clinical Psychologist, is an agency consulting doctor, meaning that the Illinois state agency that works with the Social Security Administration retained and

paid her to conduct a single examination of Plaintiff, a total stranger. *Bjornson*, 671 F.3d at 647. This type of treating relationship is one the Seventh Circuit has specifically recognized where the doctor is "unlikely [] to exaggerate an applicant's disability." *Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013). Dr. Machizawa evaluated Plaintiff over two sessions, and issued her report on October 30, 2012. [R. 441-45.]

Although Dr. Machizawa is an examining physician rather than a treating physician, the ALJ is still required to determine the weight her opinions are entitled to and explain the reasons for that finding. 20 C.F.R. § 404.1527(d), (f).

As an initial matter, the ALJ's reference to the "overall record" as allegedly supporting Dr. Machizawa'a opinion that Plaintiff was "a good candidate for competitive employment" fails to link the conclusory statements made with the objective evidence in the record and is, thus, insufficient to permit meaningful review. Nonetheless, the Court will attempt to analyze the ALJ's treatment of Dr. Machizawa's opinions.

What Dr. Machizawa actually opined is this:

> [Plaintiff] seems to have clinically significant cognitive difficulties across different domains. His cognitive deficits deem to be severe to the degree that they are likely to interfere with his ability to live independently. He also seems to have significant limitations in adaptive behavior such as daily living skills (*e.g.*, managing money, safety procedures, emergency responses) and communication skills. Nevertheless, given his motivation to work, cooperativeness, and physical strength, he seems to be a good candidate for full-time or part-time competitive employment.

[R. 445.] Additionally, Dr. Machizawa recommended that Plaintiff "receive support from a job coach at least in the beginning of the job placement until he becomes able to perform the job independently." [*Id.*]

The Court has already detailed how a claimant's ability to work in the past is not indicative of his current disability status and the importance of looking at how a claimant's past work has been performed (*see* Section 3.1, *supra*). The Court relies on that analysis here.

Finally, the Court points out that Plaintiff's past work history also includes a significant number of jobs where Plaintiff reports being terminated (usually within a week) because he was unable to perform

the jobs to his employer's specifications. Among these, Plaintiff has tried jobs as a physical laborer, including bricklayer (where he was not fast enough); inventory control (where he was unable to accurately count parts that go in/out of the trucks and read the numbers on the trucks); factory work (where he was unable to accurately put parts inside a hole on an assembly line); a warehouse (where he was unable to accurately load/unload boxes onto a skid; a security job (where he was unable to work difficult locks and write in military time); and a home improvement retailer (where he was "not learning fast enough" and was unable to find correct items/numbers for items). [R. 42-44, 119, 386, 521-23, 538-39, 887, 889.] This evidence does not indicate Plaintiff has been a good candidate for competitive employment in these past positions, nor does it seem to be indicative of good results in his future employment.[19]

In sum, the Court cannot follow any logical bridge from Dr. Machizawa's opinions to the ALJ's conclusion that the "overall record" and Plaintiff's prior work history demonstrated Plaintiff was a good candidate for future competitive employment. The Court cannot uphold the ALJ's decision on this basis.

Next, the Court addresses the ALJ's treatment of Dr. Machizawa's recommendation that Plaintiff "receive support from a job coach at least in the beginning of the job placement until he becomes able to perform the job independently." [R. 445.] The ALJ gave little weight to Dr. Machizawa's opinion because he was "not persuaded that the claimant needs a job coach in order to perform jobs within the parameters of the [RFC], as discussed in detail by the vocational expert testimony below." [R. 504-05.]

The two bits of VE testimony concerning a job coach cited by the ALJ are as follows: (1) "[t]he vocational expert testified that he found a need for supervision in this type of job to be unusual and noted

---

[19]    There is a difference between wanting to work and interact with society and possessing the intelligence and basic skills to do so at a sustainable level when your treating physicians believe you have significant difficulties even living independently. Although Dr. Gross found Plaintiff had "a strong desire to be engaged in the world, via a vocation or friendship" [R. 870, 872, 874, 876, 878, 881, 883, 885, 887, 890], he also opined that Plaintiff "will likely need substantial support throughout his life in the areas of independent living…" [R. 19] and that "long-term [Plaintiff] and his family may want to think about a residential plan for [Plaintiff] if he is no longer able to live under the supervision of his mother." [R. 20]. Likewise, Dr. Machizawa opined that Plaintiff's "cognitive deficits deem to be severe to the degree that they are likely to interfere with his ability to live independently" [R. 445]).). It is clear the ALJ, as a layperson, does not understand (and is not qualified to make) determinations in deficits in adaptive functioning for the purpose of intellectual disability, which are a medical determination. *Moore v. Texas*, 137 S. Ct. 1039, 1050 (2017).

that it would be unlikely that an individual needing supervision all of the time would be called back, as was the case with the claimant" [R. 507]; and (2) "[t]he vocational expert testified that the DOT states that simple 1-2 step instructions means that the individual should master the job within 30 days and noted that a job coach is an accommodation" [R. 508].

While the first statement seemingly calls Plaintiff's credibility into question, it does nothing to address Dr. Machizawa's recommendation that Plaintiff receive a job coach in his future employment. Even if Plaintiff were wrong about the level of supervision he received in the past (the Court does not doubt Plaintiff's belief/testimony as to the way he was supervised), and even if such supervision were "unusual," Dr. Machizawa still made this recommendation. (It is worth noting that the ALJ recognized that Plaintiff's treating physician Dr. Baber also felt Plaintiff's ability to "sustain an ordinary ritual without special supervision" was only fair, even if he gave Dr. Baber's opinion very little weight [R. 505]; the ALJ also noted that State agency consultant Dr. Cremerius found Plaintiff moderately limited in his ability to "sustain an ordinary routine without special supervision," an opinion which he gave great weight. [*Id.*]) In short, there is nothing in this first statement by the VE that could persuade an objective person that a recommendation by an impartial doctor (*i.e.*, Dr. Machizawa) that Plaintiff receive a job coach in his future employment is deserving of less than full weight.

The second statement speaks to the learning curve required under 1-2 step instructional jobs (*i.e.*, 30 days) and merely notes that a job coach is an accommodation. This fully comports with Dr. Machizawa's opinion on Plaintiff needing a job coach, as Dr. Machizawa opined that Plaintiff should "receive support from a job coach at *least in the beginning* of the job placement until he becomes able to perform the job independently." [R. 445 (emphasis added).] In fact, Dr. Machizawa's opinion is also consistent with and supported by Dr. Gross's opinion that Plaintiff "would benefit from some vocational training that may allow him to obtain part-time employment at the level of his cognitive functioning."

[R. 19.][20] Both doctors are clear in their opinions that Plaintiff will need some sort of significant preparatory help transitioning to a new job. The ALJ has failed to provide a logical bridge from the evidence (*i.e.*, two treating physicians opining that Plaintiff needed a job coach or vocational training before he would be able to familiarize himself with a new job) to his conclusion that Plaintiff did not need a job coach. The Court cannot uphold the ALJ's decision on this basis.

### 4. Conclusion

In this case, if the treating physician's opinions (key among them Dr. Gross and Dr. Machizawa) are properly credited, the Record before the Court can yield but one supportable conclusion, *see Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993), and that is that Plaintiff is disabled. When a reviewing court remands to the Appeals Council, the ordinary remedy is another administrative hearing. In unusual cases, when the relevant factual issues have been resolved and the record requires a finding of disability, a court may order an award of benefits. *Kaminski v. Berryhill*, 894 F.3d 870, 875 (7th Cir. 2018), amended on reh'g (Aug. 30, 2018) (collecting cases). Additionally, the Court here has taken into account the labyrinthine procedural history of Plaintiff's quest for benefits, laid out in Section 1.1, *supra*; Plaintiff's difficult journey must end now. The Court, therefore, awards benefits to Plaintiff and remands this matter with directions to the Commissioner to calculate the same. Accordingly, Plaintiff's motion for summary judgment [dkt. 18] is GRANTED and the Commissioner's motion for summary judgment [dkt. 24] is DENIED; the Court hereby remands the case to the agency with the instruction to calculate and award benefits to Plaintiff.

Entered: August 5, 2021

Susan E. Cox,
United States Magistrate Judge

---

[20]    Adding to the ALJ's list of errors is the fact he also failed to detail this consistency. *Hardy v. Berryhill*, 908 F.3d 309, 312-13 (7th Cir. 2018) (remanding because the ALJ failed to assess whether treating doctor's opinion was consistent with other medical opinions, noting that "failure to do so is error.").